*J. C. PUITT, ELI PASOUR and others v. COMMISSIONERS OF GASTON COUNTY.

*Constitutional Law—Local Taxation for School Purposes—Discrimination Between Races.*

1. The Constitution requires that all taxes, whether levied for State, county, town or township purposes, shall be uniform, and allows no discrimination in favor of any class, person or interest, but requires that all things possessing value and subject of ownership, shall be taxed equally, and by uniform rule.

2. Therefore, a law which allows a tax on the polls of one color and on property owned by persons of the same color, to be applied exclusively to the education of children of that color, is unconstitutional.

3. This law also discriminates between the races, by allowing the taxes paid by one, to be applied exclusively to the education of that color, and is therefore in conflict with the last clause of Art. 9, §2 of the Constitution, which is— "there shall be no discrimination in favor of or to the prejudice of either race."

4. This does not extend, however, to the law requiring the children of the two races to be educated in separate schools when the advantages are equal—nor to laws prohibiting marriage between the races, nor are such laws opposed to recent amendments of the Constitution of the United States.

(*McCormick* v. *Commissioners,* 90 N. C., 441; *Caldwell* v. *Commissioners, Ibid.,* 454; *Kyle* v. *Fayetteville,* 75 N. C., 445; *Gatlin* v. *Tarboro,* 78 N. C., 119; *Worth* v. *Rrilroad,* 89 N. C., 301; *Busbee* v. *Commissioners,* 93 N. C., 142; *Norfleet* v. *Cromwell,* 64 N. C., 16; *State* v. *Hairston,* 63 N. C., 451; *State* v. *Kennedy,* 76 N. C., 251, cited and approved).

CIVIL ACTION, heard by *MacRae, Judge,* at Chambers, on April 24th, 1884.

The action was instituted to perpetually enjoin the defendants, commissioners, from levying certain taxes for the support of schools.

His Honor refused to continue the restraining order to the hearing, and the plaintiffs appealed.

The facts fully appear in the opinion.

---

*The decision in this case was rendered at the last Term, but the opinion was not filed in time for publication in the last volume of the Reports.

PUITT v. COMMISSIONERS.

*Messrs. W. P. Bynum* and *R. W. Sandifer*, for the plaintiffs.
*Messrs. Geo. F. Bason* and *John Devereux, Jr.*, for the defendants.

SMITH, C. J.   While in this action for a perpetual injunction against the collection of a certain tax, levied by the commissioners in further support of free education of children of the white race alone, which, under our former system of judicial administration, would be exclusively cognizable in a court of equity, we would be required to look into the evidence, if properly taken and sent up, and ascertain what facts are proved, the parties are content to abide by the findings of the Court, as the facts upon which we are to declare the law.   They are as follows:

The defendants, the board of commissioners of Gaston county, under the provisions of the act of March 8, 1883, The Code, §§2594, 2595, caused an election to be held in school district No. 21 for white children, and to be submitted to the white electors therein for approval or rejection, a proposition for an additional tax of twenty cents on the one hundred dollars worth of property therein, belonging to white owners, and sixty cents upon each taxable white poll, for furnishing increased free educational advantages to the white children of the district.   At the election held accordingly on December 6, following, at which, while there were colored electors, none but white electors were allowed to vote, twenty-five votes were cast for, and twenty against the proposition, whereupon the commissioners declared it to have been carried by a majority of five votes, and directed their clerk to make out a tax list, and place the same in the hands of the sheriff, which has been done, and the sheriff is proceeding to collect said assessment.

By the act to incorporate the town of Dallas, (Private Laws, 1871–'72, ch. 46), it is provided that the town of Dallas shall constitute a school district.

The boundaries of school district No. 21 were established in 1868, and embrace a larger territory, including more persons,

voters and property, than are comprised in the corporate limits of the town of Dallas, and the boundaries of said school district have been retained as in 1868, up to the present time, and no action has ever been taken under the charter of the town of Dallas to conform the limits of the school district to the limits of said town.

If the colored voters had been allowed to vote, twenty-five would not have been a majority of the qualified voters therein, either as the district is recognized, or as it would be if confined to the limits of Dallas.

That there were sixty-three qualified white voters residing within the limits of school district No. 21 at the time of said election.

The said tax list contains a tax or assessment of twenty cents on the $100 worth of property in said district belonging to white persons, and sixty cents on the polls of the white persons residing therein, and none on the property or polls of colored persons resident therein, though there are several who reside and own property, subject to taxation therein.

A large amount of said tax or assessment is upon property and polls of persons, situate and resident outside of the corporate limits of the town of Dallas.

That the collection of said assessment will not have the effect to produce a depreciation in the value of the property subject to such assessment. As a matter of law, that the levy and collection of said assessment, is not in violation of the Constitution or the laws of the State.

It is therefore ordered, that the restraining order heretofore granted be dissolved, and that the plaintiffs pay the costs of this application, to be taxed by the clerk.

From which order the plaintiffs appeal to the Supreme Court.

The first section of the Act, prescribes the manner, such as was pursued in the present case, of ascertaining the will of the white voters on the proposed assessment in aid of schools in the district, and upon an approval, directs the further action mentioned in the next three sections, which are as follows:

SEC. 2. In case a majority of the votes cast at said election shall be in favor of such assessment, the board of commissioners shall direct their clerk to make out from the tax list of the township in which such district is situate, a list of all the taxable property and polls of the white or colored tax-payers, as the case may be, in such district, and it shall be the duty of the school committee of such district, to aid the clerk in making out said list; and said clerk shall deliver said list to the sheriff of the county, with an order signed by him, commanding the sheriff to collect said assessment in like manner as provided for the collection of State and county taxes; and said sheriff shall collect and pay over the same to the county treasurer.   And said sheriff's bond shall be liable therefor, as provided in case of the county school tax.

SEC. 3. No election, under the two preceding sections, shall be held more than once in any one year.

SEC. 4. The assessment thus levied and collected from the taxable property and polls of white persons, shall be expended in aiding to keep up the public school in said district for white children of both sexes, between the ages of six and twenty-one years; and the assessment thus levied and collected from the taxable property and polls of colored persons, shall be expended in aiding to keep up the public school in said district for colored children of both sexes, between the ages of six and twenty-one years.

The act granting a charter to the town of Dallas, ratified and taking effect on January 23d, 1872, contains the following section :

That the corporate limits of the town of Dallas, shall constitute a school district, and that all taxes levied upon the same by the State for school purposes, shall be expended in conformity with the State regulations in establishing graded schools within the town; and for the advancement of this purpose, the commissioners may appropriate a sufficient sum belonging to the corporation, to supply the deficiency, and the board of commissioners

shall select a school committee for the purpose of supervising said schools, and to perform the duties now prescribed by law. Private Acts 1871–'72, chapter 46, §45.

The appellants' claim to be relieved of the tax by a restraining order, to be made permanent on the final hearing, rests upon several grounds, and these are:

I. The school district, as comprised within the corporate limits of the town of Dallas, under the Act, is that wherein the will of the electors, regarding the proposed tax, should have been collected by a vote; and none of the electors outside, though within the boundaries of school district No. 21, should have been permitted to vote. If this be the result of the legislation, and the area covered by the town be withdrawn from the territory originally formed into a school district, the election was not held in conformity with the law, and is void, under the rulings in *McCormick* v. *Commissioners*, 90 N. C., 441, and *Caldwell* v. *Commissioners, Ibid.*, 453.

But we do not dispose of the case upon this point, since the statute creates this district to bring it under the operation of the law in reference to graded schools, removing the disability of a want of sufficient population to come under the general law, and may admit of a construction that leaves the former district, undiminished in territory, for ordinary purposes.

II. The appellants' principal objection, and this is the essential point decided in the Court below and brought up for review, is based upon an alleged repugnancy of this legislation to the Constitutions of both the State and Federal governments.

They insist that it is not uniform in its operation upon taxable property and persons, as is required by the State Constitution, Art. 5, §§3 and 6, and Art. 7, §9.

The counties are directed to be divided into school districts by the Constitution, and each becomes, with the consent of the General Assembly, a taxing territory, and, remarks BYNUM, J., delivering the opinion in *Kyle* v. *Fayetteville*, 75 N. C., 445, "whenever the power (of imposing taxes) is exercised, all taxes, whether State, county or town, by force of the Constitution,

must be imposed upon all the real and personal property, money, credits, investments in bonds, stocks, joint stock companies, or otherwise, situate in the State, county, or town, except property exempted by the Constitution."

And again: "It is the provision, and was the purpose of the Constitution, that thereafter there should be no discrimination in taxation in favor of any class, person or interest, and that everything, real and personal, possessing value as property and the subject of ownership, should be taxed equally and by a uniform rule."

The principle of uniformity pervades the fundamental law, and while not in the Constitution applied in express terms to the tax on trades, professions, &c., necessarily underlies the power of imposing such tax, and a tax not uniform, says RODMAN, J., "would be so inconsistent with natural justice, &c., that it may be admitted that the collection of such a tax would be restricted (restrained) as unconstitutional." *Gatling* v. *Tarboro*, 78 N. C., 119.

So, Mr. Justice MILLER, defining the term as used in the Constitution of Illinois, says that while one tax may be imposed upon inn-keepers, another upon ferries, and a still different tax on railroads, the taxation must be the same on each class: that is, the same tax upon all inn-keepers, upon all ferries, and upon all railroads, in their respective classes as taxable subjects. *Railroad Tax Cases*, 92 U. S., 575.

To the same effect is *Worth* v. *Railroad*, 89 N. C., 301, wherein is quoted with approval this language, used by the Supreme Court of Ohio: "Taxing by a uniform rule, requires uniformity, not only in the rules of taxation, but also uniformity in the mode of assessment upon the taxable valuation."

The proceeding conducted under the statute in the present case, widely departs from uniformity, the fundamental condition of all just authorized taxation under the Constitution It marks a color line among the qualified voters of the same territorial district, admitting only of the votes of white men in the

white district, and colored men in the colored district, in deter-
mining in their respective districts, the question of an increased
assessment for the schools.    The discrimination rests wholly
upon race, in this, as in the other provision, which confines the
taxation to the property and persons of the one or other of
the classes thus divided, as the case may be.    The same differ-
ence runs into the application of the funds.    Those derived from
one class, are devoted to the education of the children of that
class only, and denied to the children of the other, a distinction
which finds no countenance in the Constitution, but is alike
opposed to it in its general structure and in its details.

Suppose the principle was carried out, and made applicable to
the entire county—and the school districts are but divisional
parts of the county—is it not obvious it would be subversive of
the equality and uniformity recognized in the system of public
schools, which looks to a fair participation of all its citizens in
the advantages of free education?

If the separating line can be thus run, why may it not be
between children of different sexes, or between natives and nat-
uralized persons of foreign birth, or even between the former
and citizens of other States, removing and settling in this State?

These considerations clearly indicate the incompatibility of
such legislation, partial in its operation, with the equality estab-
lished in the Constitution, and to which all legislative action
must conform, in order to its being valid.

The special race distinction, moreover, is in conflict with the
concluding clause of Article IX, §2, which, after directing
that instruction shall be given to children of the two races in
separate public school, declares that "there shall be no discrimi-
nation in favor of or to the prejudice of either race."

Now it is obvious there would be no occasion for such a dis-
criminating enactment, if the results would be the same as to a
tax imposed upon all taxable subjects within the district, and
fairly distributed, so as to secure similar advantages in obtaining
an education to all the school children of either race.

Nor can we shut our eyes to the fact, that the vast bulk of property, yielding the fruits of taxation, belongs to the white people of the State, and very little is held by the emancipated race; and yet the needs of the latter for free tuition, in proportion to its numbers, are as great or greater than the needs of the former. The act, then, in directing an appropriation of what taxes are collected from each class, to the improved education of the children of that class, does necessarily discriminate "in favor of the one and to the prejudice" of the other race.

It can make no difference that the property of the white people raises the means which are expended in the education of white children, since the fund is raised by the exercise of legislative coercion, and becomes common to all, and to be used for the general benefit. It is in no sense a voluntary contribution, for with such the law does not interfere, but the results are reached by legislative action, contingent upon an approval by partial voting, but not the less legislative action for that reason, and, therefore this suit is instituted by unwilling tax-payers to arrest the collection.

The general views we have expressed, have not been seriously controverted in the argument here in support of the ruling below, but it is saught to defend the legislation, as belonging to the class of local assessments, such as have been upheld in cases where a large boundary fence, dispensing with a necessity for interior individual fences, is built and to be maintained at the expense of the lands thus enclosed and benefitted. It is unnecessary to refer to these adjudications, as they have been considered and the principle governing them declared in *Busbee* v. *Commissioners*, 93 N. C., 143.

These local assessments are not made under the restraints applicable to the exercise of the general taxing power for the public good. They are put alone upon the property assumed to be benefitted by the proposed improvement, and not upon other, which derives no special advantage from the expenditure. "The principle underlying local assessments conferring special advantages

upon land," in the words used in the opinion in this case, "is but an application of the maxim illustrated and applied in *Norfleet* v. *Cromwell*, 64 N. C., 16, *qui sentit commodum, debet sentire et onus.*"

The doctrine finds legislative recognition and support in The Code, §2824, which imposes upon the lands enclosed by a common fence, the expense of its construction and maintenance.

The statute does not provide for cases of a local assessment, but is general in its terms, and applicable to every school district in the State, and thus partaking of the character of general legislation, the tax is put upon every species of taxable property therein, except in the distinction of race ownership.

Nor do we question the right of local taxation for special local interests, not dependent upon the benefits thence accruing to property. The difference in these cases is pointed out in the work of Mr. Burroughs on taxation, 406, whose words, referring to the establishment of a school as a source of advantage to local residents, we have quoted in *Busbee* v. *Commissioners, supra.*

"Whenever a system of public instruction is established by law" (we quote from Judge Cooley's work on Taxation, page 478), "to be administered by local boards, who levy taxes, build school-houses and employ teachers for the purpose, it can hardly be questioned that the State, in establishing the system, reserves to itself the means of giving it complete effect and full efficiency in every township and district of the State, even though a majority of the people in such township or district, in a want of proper appreciation of its advantages, should refuse to take upon themselves the expense necessary to give them a participation in its benefits."

"The Legislature may authorize or make local public improvements by local taxation." 2 Desty on Taxation, 1,119.

"The imposition of taxes for educational purposes, or for maintaining the common school system, is for a public purpose." *Ibid.,* 1,118.

The principles of equality and uniformity are indispensable to taxation, whether general or local. Local taxation must be uniform upon the same class of subjects within the territorial limits of the authority levying the tax; and must be assessed upon all the property according to its just valuation.

"Whatever may be the basis of the taxation," are the words of Judge Cooley in his other work on Constitutional Law, 499, 622, "the requirement that it shall be uniform is universal. It applies as much to these local assessments as to any other species of taxes."

These references suffice to show, that in authorized local taxation for the general good of the residents within the tax district, as distinguished from those within the principle which includes large territorial boundary enclosures, it must be levied in accordance with constitutional requirements, and the property of a class, cannot be singled out to bear the burden, of which the property of another class is relieved. These universal conditions are disregarded in the present enactment, and the distinction can no more be drawn between different owners, than it can be between different kinds of taxable property of the same owner, alike subject to an *ad valorem* tax.

In the opinion we have expressed of the operation of our own Constitution upon such discriminating legislation, it is unnecessary to inquire into its consistency with the recent amendments made to the Constitution of the United States. The essence of these provisions, is to secure equal civil rights to all the citizens of a State, and especially to protect the newly enfranchised colored people, added to the body politic, in their possession and use. But they did not annul the statute long in force, which, from considerations of public policy, forbids a marriage between a white person and a negro, as expressly held in *State* v. *Hairston*, 63 N. C., 451, and recognized in *State* v. *Kennedy*, 76 N. C., 251. Nor are they repugnant to the clause in the State Constitution, which provides for the instruction of the different races in separate schools. This is so decided in *State* v. *McCann*, 21

Ohio, 208; opinion of BAXTER, C. J., in *United States* v. *Buntin*, 7 Fed. Rep., page 730, April 4, 1882, and in the concurring opinion of CLIFFORD, J., in *Hall* v. *DeCuir*, 95 U. S., 485-504.

In the latter opinion is reproduced the ruling in the case in Ohio, in these general terms: "That Court held, that it worked no substantial inequality of school privileges between the children of the two classes, in the locality of the parties; that equality of right, does not involve the necessity of educating white and colored persons in the same school, any more than it does that of educating children of both sexes in the same school, or that different grades of scholars must be kept in the same school; and that any classification which preserves substantially equal school advantages, is not prohibited by either the State or Federal Constitution, nor would it contravene the provisions of either."

To the saffe effect are *Roberts* v. *Boston*, 5 Cush., 198; *State* v. *Duffy*, 7 Nev., 342; *Clerk* v. *Board of Directors*, 24 Iowa, 266; *Dallas* v. *Fosdick*, 40 How. Pr. 249; *People* v. *Gaston*, 13 Abb. Pr. N. S., 100.

It is not, therefore, every distinction dependent upon race or color, that comes in conflict with the Federal Constitution, but only when it produces inequality in rights or interests; and when this is the result, the State legislation from which it flows, is rendered inoperative. When the same essential privileges are secured to all, such legislation is valid, and rests in the sound discretion and views of public policy of those who make the law.

We think there is error in the ruling of the Court, and that the restraining order should have been continued. Let this be certified to the Superior Court of Cleveland, that further proceedings be therein had according to law.

MERRIMON, J., concurring. I concur in the judgment of the Court, upon the ground that the defendants failed to observe the requirements of the statute, (Acts 1871-72, ch. 46); but I do not concur in so much of the opinion of the Court; as declares the statute, (Acts 1883, ch. 148, §§1, 2; The Code, §§2594, 2595), imperative and void. I am of opinion, that the latter

statute authorizes in effect a *local assessment*, and does not prescribe a public tax, in the sense of the Constitution, and that local assessments are not necessarily confined to particular real property to be affected by them favorably, in contemplation of law.

Error.                                                                 Reversed.